UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CHARLES LANDRUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:06-CV-00164 |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Charles Landrum appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Landrum applied for DIB on June 20, 2003, alleging that he became disabled as of September 20, 2002. (Tr. 213-15.)  The Commissioner denied his application initially and upon reconsideration, and Landrum requested an administrative hearing. (Tr. 216-26.)  On October 5, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Landrum, who was represented by counsel, and Robert Bond, a vocational expert ("VE")

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and thus he is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

testified. (Tr. 26-59.)  On March 4, 2005, the ALJ rendered an unfavorable decision to Landrum, concluding that he was not disabled despite the limitations caused by his impairments because he could perform his past relevant work as a mowing crew worker and a welder as he performed those jobs at the light, unskilled level, as well as a significant number of other jobs in the national economy. (Tr. 24-25.)  The Appeals Council denied Landrum's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-12, 188-94.)

Accordingly, Landrum filed a complaint with this Court on April 20, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)  This appeal became ripe for the Court's review as of May 7, 2007. (*See* Docket # 15-22.)

## II.  LANDRUM'S ARGUMENTS

Landrum alleges two errors in the Commissioner's final decision.  Specifically, Landrum claims that the ALJ erred by: (1) improperly evaluating the opinion of his treating primary care physician; and (2) determining that his testimony of debilitating limitations was "not totally credible." (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 14-18.)

## III.  FACTUAL BACKGROUND[3]

### A.  Background and Daily Activities

At the time of the ALJ's decision, Landrum was fifty-two years old, had a high school education, and possessed work experience as a welder, laborer on a mowing crew, and portable

---

[3] The administrative record in this case is voluminous (229 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

2

power washer.[4] (Tr. 29, 30, 70.)  Landrum alleged in his DIB application that he became disabled as of September 20, 2002, due to chronic back pain, fused left ankle due to amputation and reattachment, recurring cellulitis in his left foot, left knee pain, and overall joint pain. (Tr. 70.)

At the hearing, Landrum testified that he lives in a two-story home with his wife, who works outside the home during the day. (Tr. 40.)  Landrum explained that he independently performs his bathing and dressing, unless his back is "acting up," in which case he needs help donning his socks. (Tr. 41-42.)  He also stated that he does dishes "on occasion," though he can only stand at the sink leaning over for ten minutes before he needs to take a break; he further reported that he vacuums on "rare occasion," but only does "a little bit at a time" because the back and forth motion is "hard on the back." (Tr. 40.)  When asked whether he has difficulty with stairs, Landrum explained that he can no longer "run up" the 21 stairs to their second-floor bedroom, stating that he is getting ready to move their bedroom down to the main level. (Tr. 41.)  He also stated that he drives a car without difficulty with the exception of long trips, in which case he stops every 45 minutes to an hour because of his back. (Tr. 42.)  Landrum also confided that he regularly mows up to four acres of his yard with a riding mower, as he "love[s] to be outside," stating that the only difficulty he experiences is if he "hit[s] a bump that [he's] not expecting." (Tr. 44, 46.)  He explains that he generally mows in forty minute increments and then takes a break, as the mower "gets too uncomfortable" because it "bounces too much." (Tr. 50.)

---

[4] At the hearing, the VE testified that Landrum's job as a welder ranged from light to very heavy exertion depending on the particular job he was doing, that his job as a mowing crew laborer required light exertion, and that his job as a power washer could be classified as heavy work. (Tr. 51.)

3

When asked to describe a normal day, Landrum stated that he rises at 7:00 a.m. and then drinks coffee and watches the news. (Tr. 45.)  He then does the dishes. (*Id*.)  He reported that he tries to be outside by 10:00 a.m. "just to be out in the sun" and waters the flowers using a garden hose. (*Id*.)  Sometimes his grandchildren will come over, and he watches them play on the swings. (*Id*.)  He then fixes a light lunch for himself, eats it on the patio, and "watch[es] nature" until his wife comes home. (*Id*.)  When asked whether he lies down at all during the course of a day, Landrum added that he often relaxes in his recliner every afternoon for a couple of hours to give his "back a break." (*Id*.)  When asked whether he sleeps during this time, he responded affirmatively, explaining that "there's nothing on TV worth watching during the day, and boredom takes over . . . ." (Tr. 46.)  Landrum summarized his daily routine by saying "it's just not too fulfilling of a day." (Tr. 45.)

Landrum further reported that he experiences good days and bad days. (Tr. 42.)  On a good day, he explained that his pain is "[n]othing that [he] can't handle," rating it as a "4 to 5" on a ten-point scale with "0" being no pain and "10" being the worst pain possible.  (Tr. 42-43.)  In contrast, Landrum described a bad day as when he experiences pain that he "can't control" or "otherwise block," causing him to take pain medication; he rates his pain on a bad day as an "8 to 9." (*Id*.)  When asked how often he experiences bad days, Landrum stated: "For the last year, I haven't had a whole lot." (*Id*.)  He attributed this to the fact that he "ha[s]n't done a whole lot" and that he "do[es]n't lift anymore." (*Id*.)  When asked to describe a time recently when he had "overdone it," Landrum described an incident that occurred two months earlier when he suddenly jumped out of a chair and into his truck to take his daughter to the emergency room; he explained that he took Vicadin for a "couple of days" afterward. (Tr. 44.)

4

As to his physical status, Landrum explained that he can sit for "maybe an hour" but "[s]ometimes 20 minutes," and that when he stands, he generally leans against something for support. (Tr. 39.)  When asked why he thinks he could not go back to his welding work, Landrum responded that he has not found an employer that would hire someone with a twenty-pound lifting limit and that the physical position of a welder – that is, standing and leaning over – "doesn't work," as standing irritates his foot and the leaning over "messes [his] back up." (Tr. 36.)

*B.  Relevant Medical Evidence*

1. <u>Prior to Landrum's DIB Onset Date</u>

In 1966, when Landrum was a teenager, his left foot was partially amputated in a car accident and was subsequently surgically reattached. (Tr. 98, 137.)  In 1985, Landrum underwent back surgery. (Tr. 165.)  He was hospitalized briefly in 1988 and 1993 due to swelling and cellulitis in his left leg. (Tr. 110.)

In October 1995 and May 1996, Dr. Michael Rumple, his primary care physician, treated Landrum for cellulitis of his left foot. (Tr. 167.)  In June 1998, Landrum visited Dr. Rumple due to right hip pain. (Tr. 166.)  His straight leg raising test was normal, and Dr. Rumple ordered physical therapy. (*Id.*)  One week later, Dr. Rumple treated Landrum for cellulitis of his left foot, and did so again one year later. (Tr. 165.)

In August 1999, Landrum complained to Dr. Rumple of back pain radiating into his left leg. (*Id.*)  A history of recurrent low back pain was noted, which included pain shooting into the left leg to the toes. (*Id.*)  On physical examination, Dr. Rumple detected spasms and tenderness to palpation in the lumbar area. (*Id.*)  However, Landrum's straight leg raising test was negative,

5

and his neurological examination was normal. (*Id.*)  He returned one month later for a recheck and reported that his low back pain persisted in a low grade quality but that the pain in the leg and toes had resolved. (Tr. 164.)  The results of his physical examination were normal. (*Id.*)

Three months later, Landrum returned to Dr. Rumple due to a reoccurrence of his back and left leg pain. (*Id.*)  On physical examination, he was positive for muscle spasm with tenderness to palpation. (*Id.*)  He had pain with forward flexion but a negative straight leg raising test; his neurological examination was normal. (*Id.*)  Dr. Rumple ordered an MRI and referred him to a specialist. (*Id.*)

On January 18, 2000, Landrum visited Dr. Isa Canavati due to residual pain in his back, which had increased in severity during the last year. (Tr. 116-18.)  Landrum explained that the pain was aggravated by bending, twisting, lifting, squatting, or kneeling; he denied any numbness or paresthesias. (*Id.*)  He told Dr. Canavati that his back pain had been interfering with his work as a welder, as he had been missing an average of three weeks of work a year. (*Id.*)  On physical examination, Landrum had moderate paravertebral spasm with restriction of all motions of the lumbar spine; his straight leg raising test was positive on the left and included lower back and thigh pain, but was negative on the right; and his sensory examination was normal. (*Id.*)  Dr. Canavati diagnosed him with L2 through L5 advanced degenerative disk disease; spondylosis; and L2, L3-4, and L4-5 protrusion on the right. (*Id.*)  Dr. Canavati told Landrum that he was not an ideal candidate for lumbar fusion because of the multi-level disk disease but that one option would be lumbar decompression and possible diskectomies, which would provide only partial relief of his symptoms. (*Id.*)  Landrum instead decided to pursue a conservative approach; thus, Dr. Canavati prescribed Celebrex and Parafon Forte and referred him to Dr. Eric Schreier for a

physical medicine consultation. (*Id.*)

Landrum was seen by Dr. Schreier on February 9, 2000. (Tr. 127-29.)  Dr. Schreier noted that Landrum's MRI showed a disk protrusion at L3-4 and L4-5 and foraminal stenosis including the left side. (*Id.*)  Upon physical examination, Dr. Schreier noted that Landrum's left ankle was fused, that his reflexes were normal, and that his sitting straight leg raising test was negative. (*Id.*)  He also noted that there was a leg length discrepancy of one and one-half to two inches. (*Id.*)  He further detected evidence of moderate advanced crepitus and degenerative changes to his left knee; Landrum denied any significant right lower extremity symptoms. (*Id.*)  Landrum was diffusely tender, but no specific left knee tenderness was observed. (*Id.*)  Dr. Schreier agreed with the initiation of Celebrex, thought steroid treatment should be considered, and recommended that Landrum receive physical therapy and exercise instruction. (*Id.*)  Finally, Dr. Schreier indicated that he would wean Landrum back into initially modified light duty work, noting that it would be a significant challenge for him to be successful at medium heavy duty physical labor on a permanent basis. (*Id.*)

Landrum returned to Dr. Schreier in March 2000, reporting that he was doing fairly well. (Tr. 126.)  His flexibility had improved, he was able to do a full squat without difficulty, and he was able to do one-quarter of one sit-up without support. (*Id.*)  Dr. Schreier suspected that Landrum would be on permanent modified work duty, concluding that he was able to do light medium duty work at that time. (*Id.*)  Particularly, he recommended that Landrum not climb on top of trucks or get completely on his back while working with his welder and that Landrum explore vocational rehabilitation and job modification. (*Id.*)

On March 30, 2000, Landrum reported to Dr. Rumple that he injured his left foot when

he stumbled over a root in the woods. (Tr. 163.)  On physical examination, he was tender to palpation at the insertion of the plantar fascia on the calcaneus of the left foot. (*Id.*)  Eventually, Dr. Rumple diagnosed Landrum with plantar fasciitis and referred him to Dr. Dominick DeTommaso. (*Id.*)

On April 26, 2000, Landrum was evaluated by Dr. DeTommaso for his heel pain. (Tr. 120-21.)  Dr. DeTommaso diagnosed Landrum with post traumatic plantar fasciitis left. (*Id.*)  He noted that Landrum was improving with Celebrex, and thus recommended that it be continued. (*Id.*)  He also suggested that Landrum avoid high impact activities and obtain accommodative sandals. (*Id.*)

Landrum visited Dr. Schreier again in May 2000, reporting that he was doing well. (Tr. 125.)  He stated that he had cut back on heavy-duty physical activity, but his employer was unable to accommodate his medium duty work. (*Id.*)  Dr. Schreier again opined that Landrum would probably not have the physical capacity to perform greater than light medium work duty. (*Id.*)  He was seen again by Dr. Schreier in August and reported decreased symptoms and improving function. (Tr. 124.)  His spinal flexibility had dramatically improved, and he was able to do a full squat without support, though he was unable to do a full sit-up without support. (*Id.*)  There were no new focal motor deficits noted. (*Id.*)  Dr. Schreier noted that Landrum was not yet back to work and that Landrum had not contacted vocational rehabilitation services. (*Id.*)

Dr. Rumple saw Landrum several more times in August for cellulitis of his left foot. (Tr. 161, 163.)

In November 2001, Landrum was given a prescription for special stockings due to acute recurrence of cellulitis. (Tr. 160.)  In December 2001, he returned to Dr. Rumple, complaining

that his cellulitis was still causing him discomfort. (*Id.*)  He had no swelling but had some cramp-like pain in his calf; on physical examination, Dr. Rumple noted muscle atrophy in the left calf without any tenderness. (Tr. 161.)

In June 2002, Landrum visited Dr. Alan McGee, an orthopaedic surgeon, for complaints of lower back pain radiating into his left leg, which increased with bending and walking and decreased with rest. (Tr. 139-41.)  Dr. McGee noted that Landrum had normal range of motion in his lumbar spine, that his straight leg raising test was normal, and that he was able to walk on heels and toes without difficulty. (*Id.*)  He also observed that Landrum had normal neurological functioning with intact sensory responses, reflexes, and motor functioning. (*Id.*)  Upon review of Landrum's MRI, Dr. McGee found signs of degenerative disk disease of the lumbosacral spine with herniated nucleus pulposus at L2-3 and L3-4. (*Id.*)  Dr. McGee recommended physical therapy with back strengthening and stretching exercises and an increase in Landrum's Celebrex dosage. (*Id.*)

2. <u>After Landrum's DIB Onset Date</u>

In September 2002, Landrum again visited Dr. Rumple due to pain in his left leg, as well as erythema and a rash. (Tr. 158.)  Landrum returned to Dr. Rumple in March 2003, complaining of back pain and spasms, which were the result of heavy lifting. (*Id.*)  On physical examination, Dr. Rumple observed spasms and tenderness to palpation; however, his straight leg raising test and neurological examination were normal. (*Id.*)  Dr. Rumple prescribed Skelaxin and Vicodin. (*Id.*)  In May, Landrum saw Dr. Rumple again for low back pain. (Tr. 157.)  He reported that he had experienced some improvement with medication but that he still could not do any lifting. (*Id.*)  He also reported pain and occasional numbness in his hip. (*Id.*)  Dr. Rumple again

prescribed Skelaxin and Vicodin. (*Id.*)  Landrum visited Dr. Rumple several times during the remainder of 2003 for monitoring of his diabetes. (Tr. 153-54, 156.)

On June 2, 2003, Landrum visited Dr. Gregory Hoffman for evaluation and treatment of his lower back pain, as well as his bilateral extremity pain.[5] (Tr. 135-38.)  He explained to Dr. Hoffman that he had continuous pain in his lumbar spine and that the pain occasionally radiates down both lower extremities, particularly on the left side. (*Id.*)  He stated that the pain was alleviated with rest and worsened with activities, rating it as an "8" on a ten-point scale. (*Id.*)  Dr. Hoffman noted that Landrum had not undergone physical therapy recently and that, other than medication, he had not participated in "any other conservative interventions at this point." (*Id.*)  On physical examination, Landrum had increased pain in flexion and extension in his lumbar spine from L3 to S1 but had good range of motion of all joints except for his fused left ankle. (*Id.*)  He was able to heel walk and toe walk on the right but not on the left. (*Id.*)  His straight leg raise test was negative bilaterally, his muscle strength was normal (with the exception of his fused left ankle), his sensation was normal, and there was no evidence of muscular atrophy. (*Id.*)  An MRI and x-ray revealed a 3 mm spondylolisthesis of L4 anteriorly on L5, L5-S1 anterior spurring and fusion, severe stenosis at L2-3 and L3-4, and mild to moderate stenosis at L4-5. (*Id.*)  Dr. Hoffman advised Landrum to continue conservative care or pursue surgery, which would involve decompression from L2-L5 bilaterally with fusion of L4-5 and possibly L3-4. (*Id.*)

On July 22, 2003, Dr. F. Lavallo reviewed Landrum's medical record and concluded that Landrum retained the capacity to perform light work, that is, that he could occasionally lift

---

[5] The ALJ mistakenly refers in his decision to Dr. Hoffman's June 2003 report as being penned by Dr. McGee. (*See* Tr. 19; Mem. in Supp. of the Commissioner's Decision at 11-13.)

and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. 142-50.)  Additionally, he opined that Landrum could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but that he could never climb ladders, ropes, or scaffolds or be exposed to heights. (*Id*.)  In rendering his conclusion, Dr. Lavallo stated that he assigned "full" weight to Dr. Hoffman's June 2003 report. (*Id*.)  Dr. Lavallo's opinion was affirmed by a second state agency physician in December 2003. (*Id*.)

In December 2003, Dr. Rumple provided a report to the state agency on Landrum's behalf, stating that Landrum's major problem was chronic low back pain. (Tr. 152.)  Dr. Rumple reviewed Landrum's medical history, noted that Dr. Hoffman had recommended Landrum undergo a surgical procedure, and asserted that Landrum was a candidate for disability coverage due to significant symptoms secondary to chronic back problems, which Dr. Rumple contended were unlikely to be completely resolved at that time. (*Id*.)

On May 7, 2004, Dr. Rumple completed a Medical Source Statement on Landrum's behalf, diagnosing him with spinal stenosis, chronic low back pain, diabetes, and hypercholesterol. (Tr. 179-83.)  He reported that he had seen Landrum every three or four months for five years and described Landrum's symptoms as intermittent, recurrent low back pain that radiates to his legs and is worsened by physical activity and by prolonged standing. (*Id*.)  He identified clinical and objective signs as pain in the low back with radicular symptoms and severely abnormal MRI of the lumbar spine. (*Id*.)  He further stated that pain medication and muscle relaxers provide temporary relief but also may cause some drowsiness and dizziness. (*Id*.)  Dr. Rumple opined that Landrum could sit and stand for thirty minutes at a time; that he

11

could stand and/or walk for only about two hours during an eight-hour workday; that he needed

to shift positions at will from sitting, standing, or walking; that he would need to take up to three

unscheduled breaks during an eight-hour workday for ten to fifteen minutes; and that he could

lift and carry less than ten pounds occasionally and ten to twenty pounds rarely, but could never

lift and carry fifty pounds. (*Id.*)  He also opined that Landrum would likely be absent from work

more than four days per month as a result of his impairments. (*Id.*)

### IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th

Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by

substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# V.  ANALYSIS

## A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On March 4, 2005, the ALJ rendered his opinion. (Tr. 13-25.)  He found at step one of the five-step analysis that Landrum had not engaged in substantial gainful activity since his alleged onset date and at step two that he had severe impairments with respect to his non-insulin dependent diabetes mellitus, hypercholesterolemia, status-post lumbar laminectomy, status-post partial amputation of his left foot with reattachment that resulted in a fused left ankle and his left leg being 1.5 to 2 inches shorter that his right leg, recurrent cellulitis of his left lower extremity, severe degenerative disk disease from L2 through L6, spondylosis, and L2 through L5 disk protrusions. (*Id.*)  However, at step three, he determined that Landrum's impairments were not severe enough to meet a listing. (*Id.*)  Before proceeding to step four, the ALJ determined that Landrum's testimony of debilitating limitations was "not totally credible" and that he had the RFC to perform light work that involves no climbing of ladders, ropes, or scaffolds and no work around unprotected heights.[7] (*Id.*)

Based on this RFC and in reliance on the testimony of the VE, the ALJ concluded at step four that Landrum could perform his past relevant work as a mowing crew worker and a welder as he performed those jobs at the light, unskilled level. (*Id.*)  In addition, the ALJ proceeded to

---

[7] 20 C.F.R. § 404.1567(b) provides:

(b) *Light work*.  Light involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

step five where he determined that, considering his age, education, and experience, Landrum could perform a significant number of jobs within the national economy, including a counter clerk, small parts assembler, and cashier. (*Id*.)  Therefore, Landrum's claim for DIB was denied. (*Id*.)

Landrum claims, however, that the ALJ erred in denying his DIB application by: (1) improperly evaluating the opinion of Dr. Rumple, his treating primary care physician; and (2) determining that his testimony of debilitating limitations was "not totally credible."  Neither of Landrum's arguments ultimately merit a remand of the Commissioner's final decision.

### C.  The ALJ Adequately Evaluated the Opinion of Dr. Rumple, Landrum's Treating Primary Care Physician

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as a "treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).  In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of

15

the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p.  In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818-19 (N.D. Ill. 2006).  "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 818-19.  Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 818-19.  "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ." SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 818-19.

Here, the ALJ thoroughly considered Dr. Rumple's medical records, as well as his opinion that Landrum was essentially limited to sedentary work because he could only stand and/or walk for about two hours in an eight-hour workday and could only occasionally lift less than ten pounds and rarely lift ten to twenty pounds; in fact, the ALJ penned two lengthy paragraphs on Dr. Rumple's clinical findings and recommended restrictions. (*See* Tr. 19.)  The

16

ALJ ultimately concluded that, with the exception of the proffered restrictions, Dr. Rumple's opinion was generally consistent with the other treating physicians of record and the objective medical evidence. (Tr. 21.)

More specifically, the ALJ reasoned:

The opinions of the claimant's treating physicians are generally consistent with the objective medical evidence [sic] of record and their opinions are given signif[i]cant weight. Each has found severe degenerative disc disease in the claimant's lumbar spine and limitation [sic] of motion and weakness in his left foot and ankle secondary to his childhood injury. However, apart from the opinions of Dr. Rumple, his doctors generally concluded that he was able to work with lifting restrictions, which is consistent with his longitudinal record and with the fact that the claimant had a successful reattachment of his left foot when he was 14 years of age and had successful back surgery in 1984 and has worked for the past several decades with most of his current impairments, although it is clear that they have gotten somewhat worse [sic] with time. Dr. Rumple was of the opinion that the claimant was a candidate for disability benefits due mainly to his back impairments, pain and limitations. However, . . . the ultimate determination of "disability" under the Social Security Act is reserved to the Social Security Commissioner and her delegees, and opinions by other persons on such issues are not entitled to controlling weight. Accordingly that opinion of Dr. Rumple is given greatly reduced weight.

(*Id*.) Thus, with the exception of his opinion on issues reserved to the Commissioner, which was assigned "greatly reduced weight," Dr. Rumple's opinion was indeed assigned "significant weight" by the ALJ.

Consequently, Landrum is, in essence, solely challenging the ALJ's decision not to incorporate Dr. Rumple's severe restrictions into his RFC. However, "a medical source statement must not be equated with the administrative finding known as the RFC assessment." SSR 96-5p. As stated *supra*, the determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(e). Here, the ALJ carefully considered Dr. Rumple's proffered restrictions, yet found them to be inconsistent with the restrictions, or lack thereof,

assigned by other treating physicians of record, as well as Landrum's "longitudinal record," which included working for the past several decades with most of his current impairments.[8] Thus, the ALJ chose to assign Dr. Rumple's proposed restrictions little weight.

Furthermore, Landrum is simply wrong in asserting that the ALJ "did not take into account the . . . long treating relationship" between Dr. Rumple and Landrum. (Opening Br. at 14.)  Contrary to Landrum's argument, the ALJ adequately considered the factors articulated in 20 C.F.R. § 404.1527(d) when evaluating Dr. Rumple's opinion, including the length of the treatment relationship.  First, he acknowledged that Dr. Rumple was Landrum's primary care doctor, rather than a specialist. (Tr. 18.)  Second, he stated that Dr. Rumple had treated Landrum since 1995 on a "consistent basis" and, more particularly, "every three to four months." (Tr. 18, 19, 20); *see Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("[T]he ALJ must take into account the treating physician's ability to observe the claimant over a longer period."); *see generally White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) ("Indeed, it is difficult to think of more appropriate factors than a physician's speciality and familiarity with the patient and his medical history when determining how much weight to assign to his opinions.").

Though he considered Dr. Rumple's ability to observe Landrum over a longer period of time, the ALJ nonetheless determined that the inconsistency between Dr. Rumple's restrictions and other significant evidence of record was sufficient reason to discount Dr. Rumple's opinion

---

[8] In fact, when asked in his June 30, 2003, Disability Report how his illnesses, injuries, or conditions limit his ability to work, Landrum responded: "I have a 20 pound weight limit.  No twisting, turning, squa[t]ting, stooping, leaning over 30 degree angle, no more than 4 steps per day: doctor's restrictions." (Tr. 72.)  Thus, even Landrum describes his limitations as less restrictive than those proffered by Dr. Rumple.

Curiously, though Landrum reported on his Disability Report and at the hearing that he had a four-steps per day physician's restriction, Landrum testified that he was still ascending and descending the twenty-one steps to his second-floor bedroom on a daily basis. (Tr. 41, 72.)

with respect to Landrum's restrictions. *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); *see generally Stephens*, 766 F.2d at 288 ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  We will not accept Landrum's invitation to merely reweigh the evidence at this juncture. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

        In sum, contrary to Landrum's argument, the ALJ sufficiently evaluated Dr. Rumple's opinion and adequately explained his rationale for assigning it the weight that he did, allowing this Court to adequately trace his path of reasoning with respect to the ultimate assignment of Landrum's RFC. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)); *see generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (stating that when reviewing an ALJ's decision, a court will "give the opinion a commonsensical reading rather than nitpicking at it" (citation omitted)).  Consequently, Landrum's first argument does not merit a remand of the Commissioner's final decision.

### D.  The ALJ's Credibility Determination Will Not Be Disturbed

        Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see*

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and

logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th

Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at

435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's

credibility determination because the ALJ's decision was based on "serious errors in reasoning

rather than merely the demeanor of the witness").

Here, the ALJ determined that Landrum's testimony of debilitating limitations was "not

fully credible," finding it "inconsistent with the objective medical evidence, the absence of more

aggressive treatment and [Landrum's] ordinary activities." (Tr. 21.)  The ALJ then cited specific

examples from the record of each type of inconsistency to illustrate his conclusion.  For example,

the ALJ noted that when Landrum was examined by Dr. McGee in 2002, he had good range of

motion in all joints except his left ankle, which was fused; he could heel and toe walk on the

right; he had a negative straight leg raising test; and he had normal muscle strength bilaterally

with the exception of his left ankle. (*Id*.)  Likewise, he also emphasized that Landrum has no

mental or emotional problems or any significant limitations with the use of his hands or upper

extremities. (*Id*.)  In addition, he observed that Landrum had not required additional surgical

intervention since the 1980's and that he did not require the use of an ambulatory aid. (*Id*.)

Moreover, the ALJ explained that Landrum has been able to work on his left ankle in some

heavy-exertion level jobs for over twenty-five years and that his impairments do not prevent him

from routinely performing daily activities that include caring for his personal needs, doing

dishes, mowing a large lawn with a riding mower, and vacuuming when necessary. (*Id*.)

Landrum, however, argues that the ALJ erred in discounting his credibility.  In his

opening brief, Landrum asserted that the ALJ erred by selectively reviewing only the medical

evidence that favored his ultimate conclusion.  More specifically, Landrum contended that the

ALJ failed to consider the report of Dr. Hoffman, who noted in 2003 that Landrum had increased

pain in flexion and extension in his low back. (Opening Br. at 15.)  However, Landrum concedes

this argument in his reply brief (Reply Br. at 3), and rightly so, as the ALJ did indeed consider

Dr. Hoffman's 2003 report, though he mistakenly referred to it in his opinion as a report from

Dr. McGee. *See generally Shramek*, 226 F.3d at 814 (explaining that harmless errors are those

that do not ultimately impact the outcome of the determination).  Moreover, the ALJ ultimately

assigned substantial weight to the opinion of Dr. Lavallo, who *expressly stated* that he relied

upon Dr. Hoffman's report in rendering his opinion. (Tr. 22.)  Thus, Landrum's argument

concerning the ALJ's alleged selective review of the objective medical evidence instantly

collapses.

Next, Landrum criticizes the ALJ's conclusion that his subjective symptoms were

inconsistent with "the absence of more aggressive treatment." (Tr. 21.)  In rendering this

conclusion, the ALJ noted that Landrum's impairments "have not required additional surgical

intervention since the 1980's." (*Id.*)  Landrum, however, emphasizes that Dr. Canavati told him

that he was not an ideal surgical candidate because of his multi-level disk disease, though he

acknowledges that Dr. Canavati also advised him that a lumbar decompression and possible

diskectomies would provide partial relief of his symptoms.  Regardless, in evaluating his

subjective complaints, the ALJ was entitled to consider as a factor in his analysis the type of

treatment that Landrum has undergone, *see* 20 C.F.R. § 404.1529, which in this case is solely

conservative treatment measures.  In that vein, the ALJ also noted in his opinion that Landrum only took pain medication when he had a bad day (which involved pain of an "8" on a ten-point scale) and that he "had not had a lot of bad days in the preceding year." (Tr. 20.)

In addition, Landrum argues that the ALJ selectively reviewed the evidence with respect to Landrum's daily living activities.  More particularly, Landrum argues that the ALJ failed to acknowledge that he rests frequently while performing activities such as vacuuming, doing dishes, or mowing his four-acre lawn. (Opening Br. at 16-17.)  However, contrary to Landrum's argument, the ALJ specifically reiterated in his opinion Landrum's testimony that he did dishes "slowly because of back pain," that he could stand at the sink "for only ten minutes," and that he usually "took a nap for a couple of hours in the afternoon." (Tr. 20.)  Thus, the ALJ did not turn a blind eye to Landrum's testimony that he incorporates rest periods into his daily routine, *see Kendrick v. Barnhart*, No. 1:04CV0292DFHTAB, 2005 WL 1025777, at *10 n.4 (S.D. Ind. 2005), but simply considered Landrum's regular performance of these activities as one factor in assessing the credibility of his testimony. *See* 20 C.F.R. § 404.1529(c)(3); *Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see generally Bohrman v. Massanari*, No. 00-C-715-C, 2001 WL 1913387, at *12 (W.D. Wis. Aug. 22, 2001) (distinguishing cases in which the ALJ relied almost exclusively on the claimant's daily activities when accepting one physician's opinion of a claimant's abilities over another physician's opinion, from cases in which the ALJ cited a claimant's daily activities as one of several reasons to accept one physician's opinion of a claimant's abilities over another).

Finally, after arguing that the ALJ erred by relying upon his conservative treatment regime and his performance of daily activities, Landrum contends that the ALJ's credibility analysis must fall, emphasizing that it cannot stand upon the objective medical evidence alone. *See Schmidt*, 395 F.3d at 746-47 (articulating that an ALJ is precluded from "relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding").  More particularly, Landrum contends that the ALJ failed to examine other evidence in accordance with 20 C.F.R. § 404.1529(c),[9] contending that such evidence indicates that his symptoms are of a greater severity than can be shown by the objective medical evidence alone. (Opening Br. at 15-16); *see* SSR 96-7p.  However, as concluded *supra*, the ALJ adequately considered a variety of factors relevant to Landrum's symptoms in addition to the objective medical evidence, including his medication usage, his treatment measures, and

---

[9] More specifically, 20 C.F.R. § 404.1529(c) states:

Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.,); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

23

his daily activities.  Thus, the ALJ did not run afoul of 20 C.F.R. § 404.1529(c).[10]

In sum, Landrum's attack on the ALJ's decision fails to warrant a remand, as the ALJ built an accurate and logical bridge between the evidence and his credibility determination, *Shramek*, 226 F.3d at 811, and his determination is not "patently wrong." *Powers*, 207 F.3d at 435.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Landrum.

SO ORDERED.

Enter for this 30th day of July, 2007.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[10] In addition, Landrum argues that the ALJ erred by making the following statement at the beginning of his credibility determination: "The claimant's allegations that he can perform no sustained work activity . . . are not fully credible." (Tr. 21.)  Landrum emphasizes that his testimony "is not that he is unable to perform *any* sustained work activity but that he is unable to sustain light work activity." (Opening Br. at 14 (emphasis added).)  The Court perceives this nit as immaterial, considering that when Landrum was asked in his Disability Report why he stopped working, he alleged: "My left foot swells up and I can't walk on it. I can't do prolonged standing or sitting due to my back." (Tr. 73.)  Thus, if Landrum's allegations as set forth in the Report were fully credited, he would likely be unable to perform even sedentary work. *See* 20 C.F.R. 404.1567(a); *see generally Rice*, 384 F.3d at 371 (concluding that the claimant's "argument amounts to nothing more than a dislike of the ALJ's phraseology").